United States District Court
Southern District of Texas
**ENTERED**
July 28, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN HALL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-21-1769 |
| | § | |
| STATE FARM LLOYDS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

This is an insurance coverage dispute. John Hall alleges that his home was damaged by an explosion that occurred 1.8 miles away. The parties dispute the cause and extent of any damage. State Farm has moved for summary judgment, submitting reports from two engineers who separately inspected the property and concluded that the damage they observed was not caused by the explosion, but instead by "normal wear and tear, minor material and installation deficiencies, a lack of maintenance, as well as expansion and contraction of the building materials due to naturally occurring variations in temperature and humidity." (Docket Entry No. 24-2, at 5). Hall responded with a report from an engineer who did not visit the property, did not review State Farm's experts' reports, and did not state any basis for opining that the home "seemed" to be damaged by the explosion. Hall also submitted a report from a meteorologist whose speculations as to the root cause of the alleged damage are both beyond his expertise and unhelpful.

Based on the pleadings, the motions and responses, the parties' submissions, and the applicable law, the court grants State Farm's motion for summary judgment and grants in part and denies in part State Farm's motion to exclude Hall's expert witnesses. (Docket Entries Nos. 20, 24). The reasons are explained below.

I.      **Background**

Hall has a homeowner's insurance policy with State Farm. The policy "insure[s] for accidental direct physical loss to the property," but it does not cover losses caused by natural wear and tear, deterioration, or "settling, cracking, shrinking, bulging, or expansion of . . . foundation, walls, floors, roofs, or ceilings." (Docket Entry No. 24-2, at 17–18).

On January 24, 2020, a propylene-tank leak caused an explosion at Watson Grinding and Manufacturing at 4525 Gessner Road, in Houston, Texas. (*Id.*, at 13). Hall's home—which was built in 1960 and which Hall purchased in 1983—is 1.8 miles from the explosion site. Hall did not hear or feel anything from the explosion, which occurred when he was asleep. (Docket Entry No. 24-3, at 4). He heard about the explosion later that day on the news.

After learning of the explosion, Hall inspected the home "but . . . did not see any damage at that time." (*Id.*). Hall began to suspect that he "did, in fact, sustain damage to [his] home from that explosion" only when the ceiling in his garage fell down six or seven months later, in July or August 2020. (*Id.*). After Hall removed fallen sheetrock from the garage floor, he inspected the ceiling and noticed that "the joists . . . were bowed." (*Id.*). Hall saw no other damage on the inside or outside of his home. (*Id.*, at 6).

Hall retained counsel and submitted a claim in September 2020 under the policy. In April 2021, Hall filed this lawsuit against State Farm, even though it had yet resolved Hall's claim. The delay was largely due to difficulties in getting the property inspection done. Hall asserted claims for breach of contract, breach of the duty of good faith and fair dealing, deceptive trade practices, violations of the Texas Insurance Code, fraud, and conspiracy. (Docket Entry No. 1-3). The complaint included seemingly irrelevant and false allegations, including that State Farm acted in bad faith "in an action for property damage due to plumbing leaks" and that "the insurer was found

2

to have hired an investigating firm biased against finding liability." (Docket Entry No. 1-3, at 9). Hall's claim was not for "plumbing leaks," and State Farm had not denied Hall's claim at that point.

State Farm had inspected Hall's property only a few days before Hall filed his lawsuit. One reason for the delay was that the engineer State Farm hired to inspect Hall's property "asked to be removed" from the assignment because of "concerns in regards to communication between [Hall's] attorney rep and the engineer . . . and directives [from Hall's attorney] on how the inspection was going to be completed." (Docket Entry No. 24-2, at 8). That engineer later "submit[ted] an invoice for the amount of time" he spent unsuccessfully "attempt[ing] to coordinate the visits" to Hall's property. (*Id.*, at 7). In short, Hall's counsel appears to have been a significant reason for State Farm's delay in adjusting the claim.

State Farm did retain a second engineer—Dan Rich from Rich Engineering—who was able to inspect the property in March 2021, but not without difficulty. Hall's counsel refused to allow Rich to speak with Hall "regarding the history of the residence or the damage that was being attributed to the WGM explosion." (Docket Entry No. 24-2, at 12; *see also id.*, at 6). At the time of the inspection, "Rich Engineering was not informed of what damage Mr. Hall was specifically attributing to the explosion." (*Id.*, at 14). After the inspection, Rich Engineering emailed Hall's counsel a list of questions about the property. Neither Hall nor his counsel responded. (*Id.*, at 12).

Based on the inspection, Rich Engineering concluded that "[t]he residence was not damaged by the explosion." (*Id.*, at 15). The report states that: the "foundation was not damaged by the explosion"; cracks in the drywall "were consistent with normal wear and tear, minor material and installation deficiencies, a lack of maintenance, as well as expansion and contraction of the building materials due to naturally occurring variation in temperature and humidity"; the

3

roof was not damaged; cracks in the attic framing "were aged . . . indicat[ing] that the damage predated the explosion"; the "brick veneer cracks had an aged appearance which indicated that they predated the explosion"; and "Rich Engineering did not observe any broken window panes during its site visit." (*Id.*, at 13–15).

As a result of Rich Engineering's report, State Farm informed Hall's counsel in May 2021 that it was denying Hall's claim. The denial letter stated that State Farm's "investigation revealed the residence was not damaged by the explosion." (Docket Entry No. 24-2, at 17–21).

State Farm also hired a structural forensic investigator to inspect the property. (Docket Entry No. 24-4). State Farm retained Jarrod Burns of BSC Forensic Services, LLC "to document conditions consistent with the effects of an explosion that occurred on January 24, 2020, at the Watson Grinding Facility, if any." (*Id.*, at 1). The BSC report noted that Burns "inspected the subject property for conditions consistent with the effects of an explosion," including "displaced or missing relatively lightweight elements (satellite dishes, fending, etc.), fractured cladding or fenestration components (windows, siding, garage doors, etc.), and if sufficient blast energy had occurred, structural shifting or movement and resulting distress in the building components." (*Id.*, at 5). The report stated that "BSC's inspection revealed no conditions at the subject property that could be attributed to energy waves associated with the reported explosion," and noted that "the surrounding properties of similar construction also exhibited no such evidence." (*Id.*). The report also stated that "no such conditions would be expected . . . as the subject property was located approximately two . . . miles southeast of the blast origin." (*Id.*). The report concluded that the "collapsed ceiling in the garage . . . was attributable to long-term sagged condition of the ceiling joists associated with improper lumber (large knots) and excessive loading from roof beam

4

supports in the attic space above," and that this condition was not "caused or exacerbated by the reported explosion event." (*Id.*).

State Farm's motion for summary judgment is based on the legal standard and the admissible record, as described below.

## II. The Summary Judgment Standard

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex rel. Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citations and internal quotation marks omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments LLC*, 914 F.3d 940, 946 (5th Cir. 2019) (citation and internal quotation marks omitted). In deciding a summary judgment motion, "the evidence of the nonmovant is to

be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

### III. The Summary Judgment Record

State Farm submitted the following exhibits in support of its motion for summary judgment:

- John Hall's Homeowner's Insurance Policy, (Docket Entry No. 24-1);

- State Farm's claim file, (Docket Entry No. 24-2; Docket Entry No. 25-1)[1];

- Rich Engineering's Residential Explosion Damage Evaluation, (Docket Entry No. 24-2);

- a letter from State Farm to Dick Law Firm denying Hall's damage claim, (Docket Entry No. 24-2);

- the deposition transcript of John Hall, (Docket Entry No. 24-3); and

- the report by BSC, (Docket Entry No. 24-4).

Hall submitted the following exhibits in his response to State Farm's motion for summary judgment:

- an estimate of repair work by Quantum Claim Consulting Services, including photographs of the property, (Docket Entry No. 26-1);

- a report by Greg Degeyter, a lawyer and meteorologist, (Docket Entry No. 26-2); and

- a report by Shiran Perera, an engineer and president of MS2R Engineering, (Docket Entry No. 26-3).

---

[1] State Farm moved to supplement the summary judgment record with a corrected version of Mark Malia's Unsworn Declaration, which accompanied the claim file. The motion to supplement, Docket Entry No. 25, is granted.

### IV. The Motion to Exclude Expert Testimony

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if
>
> > (1)  the testimony is based upon sufficient facts or data,
> >
> > (2)  the testimony is the product of reliable principles and methods, and
> >
> > (3)  the witness has applied the principles and methods reliably to the facts of the case.

"Rule 702 charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (5th Cir. 2002) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993)).  Expert testimony must be both "relevant and reliable" to be admissible. *United States v. Tucker*, 345 F.3d 320, 327 (5th Cir. 2003) (quoting *Pipitone*, 288 F.3d at 243–44); *Daubert*, 509 U.S. at 589 ("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

In making its reliability determination, the court considers the soundness of the general principles or reasoning on which the expert relies and the propriety of the methodology that applies those principles to the facts of the case. *Daubert*, 509 U.S. at 594–95; *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997).  Several factors guide a district court's inquiry into the reliability of expert testimony, including whether the expert's technique or theory can be or has been tested; whether it has been subjected to peer review and publication; whether the expert has unjustifiably

7

extrapolated from an accepted premise to an unfounded conclusion; whether the expert has adequately accounted for obvious alternative explanations; and whether the expert's claimed field of expertise is known to reach reliable results for the type of opinion the expert would give. *Whitney Nat. Bank v. Air Ambulance by B&C Flight Mgmt., Inc.*, 516 F. Supp. 2d 802, 815–16 (S.D. Tex. 2007) (citations omitted).

Admissibility of expert testimony is an issue for the trial judge to resolve under Federal Rule of Evidence 104(a). *Daubert*, 509 U.S. at 592–93. The party offering the testimony must prove by a preponderance of the evidence that the expert's opinion is relevant and reliable. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987); *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (Cir. 2002). "A trial court's ruling regarding admissibility of expert testimony is protected by an ambit of discretion and must be sustained unless manifestly erroneous." *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1317 (5th Cir. 1995) (citation omitted).

### A.   Greg Degeyter's Report

Greg Degeyter is a lawyer who has also worked as a volunteer meteorologist and an adjunct professor in Lamar University's Department of Earth and Space Science. Hall has designated Degeyter as a "meteorologist consultant." (Docket Entry No. 31-2).

Degeyter's resume states that he is typically hired to "[c]ompare damage pictures to known meteorological conditions at a property address to opine as to whether the meteorological conditions were capable of causing the pictured damages and should they be considered the proximate cause for damages to the property." (Docket Entry No. 31-2, at 17). Here, however, Degeyter was not asked to opine on meteorological conditions. Hall's home was not damaged by any weather condition. Degeyter was asked to opine as to the "expected range for widespread

8

damage as a result of the explosion" and whether the damage on Hall's home "is expected in a blast damage situation." (*Id.*, at 14-15).

Degeyter himself notes that "it may seem odd to have a meteorologist opine as to blast related effects." (Docket Entry No. 31-2, at 3). Degeyter asserts that "the physics involved with a blast are the same as involved with meteorology," because "[t]he Journal of Applied Meteorology published articles, one of which is used herein, and blast waves have similar characteristics with undular bores, a meteorological phenomenon." (*Id.*, at 3). The article that Degeyter relies on, which was not presented for the court to review, is from March 1962. Degeyter has not explained what undular bores are, how blast waves are similar, or how the relation between undular bores and blast waves could reasonably lead Degeyter to conclude that Hall's home was damaged by an explosion occurring 1.8 miles away and six months earlier.

Degeyter's report starts by looking at RADAR imagery from the day and time of the explosion. Degeyter claims that "the RADAR was able to capture the explosion," and attaches RADAR images that he claims show that the "blast wave" would have been felt at Hall's home, 1.8 miles from the explosion location. (*Id.*, at 15).



Pre Explosion



Explosion

Degeyter notes that he "called the Houston-Galveston National Weather Service office for an opinion [on] how the RADAR was able to capture the explosion," but "[t]hey were unable to offer an explanation." (*Id.*, at 4). Degeyter speculates that a "pressure wave" from the explosion "caused water vapor to condensate" until the "water droplets then evaporated." (*Id.*). Degeyter asserts, without explanation, that the RADAR captured the condensation caused by the blast wave, "and that the blast would still be detectable a few minutes after the explosion—it took a few minutes for the water droplets to evaporate." (*Id.*).

Degeyter has not addressed whether the RADAR image simply reflects precipitation—which is common in the area—occurring at that time. And even assuming that Degeyter's theory—that the RADAR did capture the blast wave—is correct, the RADAR imagery does not support his other claims. First, the RADAR image does not show or support an inference that the explosion damaged or affected homes 1.8 miles away. Degeyter's assertion that a property within 1.8 miles

10

of the explosion was "within the expected range for widespread damage as a result of the explosion" is not supported by the research he cites or by his work or training as a meteorologist. Degeyter's assertion that the pictures of Hall's home "are consistent with a broad impact rather than a windblown debris type of impact" is similarly unsupported by the RADAR imagery or the cited research and is similarly outside his field of expertise.

Degeyter, as a meteorologist, is qualified to testify as to weather events at Hall's property. Degeyter is perhaps qualified to testify as to whether certain weather events are likely to cause property damage. But Degeyter is unqualified to testify as to the extent of the effects of a distant explosion and whether the damage found in Hall's home was at all related to that explosion. Indeed, Degeyter was not designated by Hall as an expert able to testify as to causation, but instead was designated as "a meteorologist who is expected to testify that an explosion near [Hall's home] occurred . . . during the policy period." (Docket Entry No. 20-2, at 7). At best, Degeyter's report confirms that there was an explosion on January 24, 2020, and that it caused "water vapor to condensate" around the site, allowing RADAR imagery to detect that an explosion had occurred. Degeyter's report is excluded to the extent that it is used to support Hall's allegations that the explosion caused any damage to Hall's home.

B.   **Shiran Perera's Report**

Shiran Perera is a structural engineer who was designated to opine on whether the blast "caused damage[] to the insured property." (Docket Entry No. 20-2, at 3). State Farm has moved to strike Perera's report because it was produced late, and because Perera's opinions are unreliable.

Perera's report was produced 18 days after the extended expert designation deadline. (Docket Entry No. 20, at 2). Federal Rule of Civil Procedure 26(a)(2)(B) requires a written report to accompany the disclosure of an expert witness under Rule 23(a)(2). Rule 23(a)(2)(C) instructs

11

the parties to provide an expert report within the time stated in the court order. If the party fails to provide timely information, "the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In determining whether the failure was substantially justified or harmless, the court considers: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Huffman v. City of Conroe*, No. H-07-1964, 2008 WL 4453563, at *1 (S.D. Tex. Sept. 26, 2008) (quoting *Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003)).

Hall has not explained his failure to timely disclose Perera's expert report, but State Farm does not appear prejudiced by the 18-day delay. State Farm was able to review the report and move for summary judgment. The delay is also moot because the report is excluded as unreliable and unhelpful.

In preparing his report, Perera reviewed only the photographs taken by Quantum Claim Consultants and Degeyter's report. (Docket Entry No. 31-3). Perera did not review State Farm's reports from the engineers who actually inspected Hall's property and concluded that damage was due to natural wear and tear. Perera did not visit the property. Perera relies on photographs of the property that were taken in October 2020, almost 10 months after the January 2020 explosion and several months after the belated garage ceiling damage. (*Id.*, at 6).

Perera's report does not conclude that Hall's home was damaged by the explosion. Instead, Perera's report includes a number of caveats and very tentative possibilities as to causation, as opposed to justified opinions about causation. The following examples make this clear:

- "The inspector has found some of the cracks on the exterior brick veneer. . . . Those cracks do not seem to be old, as they are not extensively weathered. Those cracks seem to be consistent with a possible vibration or pre-existing age-related cracks worsened by a vibration." (Docket Entry No. 31-3, at 6).

- "The inspector also found that there are multiple cracks along the interior side of the window connections with the wall. . . . [T]he pictures are not sufficiently detailed pictures to confirm any new looking crack along the joints. If those cracks are not pre-existing, those can be results of the vibration." (*Id.*).

- "There are some cracks along the vertical as well as horizontal grooves of the bathroom tiles. . . . Those cracks seem to be consistent with the vibration." (*Id.*).

- "There are also multiple cracks on the ceiling. . . . Those images are not detailed enough to identify the age of those cracks; however, they also seem to be a part of vibration related damages." (*Id.*).

- "Based on the information listed in the inspection report . . . it is more likely that the damages found on the structure and finishing on the subject property is consistent with possible damages that could create [sic] by a vibration." (*Id.*, at 7).

Perera speculates that there was some damage that "seemed" to be related to or could "possibly" be consistent with vibration-related damages. Perera did not consider that Hall's home was built in the 1960s and purchased in the 1980s, or that Hall had not "done any remodeling or made any major upgrades or alterations to the home" since 1983. (*See* Docket Entry No. 24-3, at 3). Perera did not consider Rich Engineering's or BSC's reports, which were based on actual inspections of the property, and which concluded that the damage was due to natural wear and tear, humidity, and age.

Perera also did not consider Hall's own testimony that he did not see any new damage to his home immediately after the explosion, or that he suspected the explosion as the cause only "[w]hen the ceiling fell down in the garage" some six months later. (Docket Entry No. 24-3, at 4). Perera did not consider Hall's own testimony that "[o]ther than the ceiling collapsing in the garage and seeing the bowed rafters or joints," he did not "see any other items, either on the inside or the

13

outside of [his] home[] that looked different that [he] thought was some sort of damage caused by the explosion." (*Id.*, at 6).

Perera also relied on unreliable evidence. Perera states that "[t]he vibration analysis report prepared by Degeyter . . . clearly explains that it is possible to have significant structural damage on the subject structure related to the explosion occurred . . . . Accordingly, the found damages on the structure are consistent with the explosion occurred [*sic*] on Watson Grinding and Manufacturing facility at 4500 Gessner, Houston." (Docket Entry No. 31-3, at 7). Perera relies on Degeyter's report for the conclusion "that it is possible to have significant structural damage . . . related to the explosion," a conclusion Degeyter was not qualified to make.

At best, Perera's report states that some of the damage others reported at the property—which Perera did not inspect—"could" have been caused by the explosion. Even that tentative assessment is unreliable. Perera did not weigh or consider relevant information, including reports from actual inspections or Hall's own statements. Perera did not include a resume with his report, and he did not cite to sources other than Degeyter's report and Quantum Claim Consultants' repair expense report, that would allow the court to conclude that the speculations are based on a reliable methodology. Perera's report is excluded, because it does not reliably support that the explosion caused damage to Hall's home.

V.  **The Motion for Summary Judgment**

To support a claim of breach of an insurance contract under Texas law, the insured must show coverage, that the contract was breached, that the insured was damaged by the breach, and the amount of resulting damages. *Block v. Employers Cas. Co.*, 723 S.W.2d 173, 178 (Tex. App.—San Antonio 1986), *aff'd*, 744 S.W.2d 940 (Tex. 1988). The insured has the burden to plead and point to evidence that the insurance policy covers the claimed damage. *Harken Exploration Co.*

14

*v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001); *W. Alliance Ins. Co. v. N. Ins. Co.*, 176 F.3d 825, 831 (5th Cir. 1999).

The dispute is whether the damage to Hall's home was caused by an explosion months earlier and 1.8 miles away. State Farm has presented ample evidence that "[t]he residence was not damaged by the explosion." (Docket Entry No. 24-2; Docket Entry No. 24-4). The admissible evidence that Hall has used to counter State Farm's evidence does not create a factual dispute material to determining the cause of the damage. Hall's evidence—construed generously—supports only the conclusions that Hall's home had several structural issues (as demonstrated by the photographs), that an explosion 1.8 miles away occurred in January 2020, and six months after the explosion, parts of the garage ceiling fell, and some cracks were found. Hall has presented no evidence that the explosion did, in fact, damage his home.

The evidence admissible on summary judgment shows that, as a matter of law, State Farm did not breach the policy by denying Hall's claim for coverage. The breach of contract claim is dismissed. Hall has not pointed to or presented admissible evidence showing that State Farm violated the Texas Insurance Code, engaged in deceptive trade practices, breached a duty of good faith and fair dealing, conspired to commit illegal acts, or committed fraud. These claims are also dismissed.

## VI. Conclusion

State Farm's motion to exclude Hall's experts, Docket Entry No. 20, is granted in part and denied in part. State Farm's motion for summary judgment, Docket Entry No. 24, is granted. This case is dismissed, with prejudice.

Final judgment is entered by separate order.

SIGNED on July 28, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge